[Cite as *In re A.M.*, 2023-Ohio-1366.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

IN RE A.M.                                :

                                          :                 No. 111603

A Minor Child                             :

                                          :

[Appeal by V.J., Mother]                  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 27, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. FA-18204025

---

*Appearances:*

Jessica A. L. Camargo, *for appellant*.

Lon'Cherie' Billingsley and Tyresha Brown-O'Neal, *for appellee*.

LISA B. FORBES, J.:

## I.     Facts and Procedural History

{¶ 1}    This case involves the custody and shared parenting schedule of A.M., who was born June 4, 2015.  T.M. ("Father") and V.J. ("Mother") are the parents of A.M.  Father was mostly absent from the first two years of A.M.'s life.

**{¶ 2}** On March 26, 2018, Father filed an application to determine custody in the juvenile court. On May 14, 2018, the court ordered that Father and Mother "share custody and that both parents be designated custodial and residential parents" with Mother designated as the residential parent for school purposes. Additionally, the court adopted Mother and Father's "shared parenting statement" (the "SPS"), which allocated parenting time between the parties. The main gist of the SPS was that Mother and Father "shall have parenting time every other Sunday starting at 5:00 pm until the following Sunday at 5:00 pm * * *." In other words, Mother and Father alternated weeks.

**{¶ 3}** Over the next six months, Mother and Father filed motions to show cause and motions to modify the SPS, each alleging that the other was not complying with the SPS. On November 16, 2018, the court issued a journal entry finding that Father had no visitation time with A.M. since August 2018, which is when Father married J.M. ("Stepmom"). The court also found that Mother and Father "cannot reach an agreement, and there is conflict between them."

**{¶ 4}** On November 20, 2018, the court appointed a guardian ad litem ("GAL") for A.M. On December 17, 2018, the court found Mother to be indigent and appointed counsel to represent her in these proceedings.

**{¶ 5}** On January 17, 2019, Father filed another motion to modify the SPS. On May 10, 2019, the GAL submitted his report, which recommended that "Legal Custody to Mother would be in A.M.'s best interest, with Father on a standard visitation schedule of every other weekend and one weeknight."

{¶ 6} In a journal entry dated June 16, 2019, the court adopted an "agreement of the parties," which modified the SPS, allowing for additional parenting time for Father as "make-up time" for certain dates when Mother denied Father visitation. In turn, Father withdrew his motion to modify the SPS.

{¶ 7} On November 6, 2019, Mother, acting pro se, filed a motion to modify custody and the SPS. In this motion, Mother stated that on October 23, 2019, A.M. told her that Father's minor stepson ("Stepbrother") "makes her touch on his private area with her hands and her private area." On November 7, 2019, the court again found Mother indigent and appointed new counsel to represent her in these proceedings for the second time.

{¶ 8} Father filed a motion to modify custody on April 3, 2020, requesting that he be granted legal custody of A.M. based on the following: "Mother has now accused [Stepbrother] of sexually abusing [A.M.] and has again withheld [A.M.] for months of parenting arbitrarily. She has withdrawn [A.M.] from daycare without any notification, disconnected all my communication with [A.M.] and continues to coach [A.M.] to make false allegations."

{¶ 9} On May 20, 2020, the court issued a journal entry modifying the SPS as follows: "Pick up and drop off will be from the Maple Heights Police Department. [Stepbrother] shall be removed from his home on the scheduled visitation weekends with [A.M.]."

{¶ 10} On June 26, 2020, Mother's first appointed counsel filed a motion for leave to withdraw from representing her in this case.

{¶ 11} On August 20, 2020, the court issued a journal entry granting Father additional parenting time as follows: "every Sunday, beginning August 23, 2020, from 9:00 a.m. until 6:00 p.m."

{¶ 12} The court held a hearing on April 7, 2022, "to litigate all pending motions * * *." On May 5, 2022, the court issued a journal entry concerning this hearing. Specifically, this journal entry ordered that "Mother and Father shall remain custodial and residential parents but Father * * * shall be designated the residential parent for school purposes." The court modified the SPS accordingly, ordering that Mother receive parenting time on the first, second, and fourth weekends of each month, and "Father's parenting time is any time not designated to Mother * * *." The court ordered that visitation on "[h]olidays, vacations, and birthdays shall remain the same" as the initial SPS. The court overruled all motions to show cause and dismissed any other motions that remained pending.

{¶ 13} It is from this order that Mother appeals raising five assignments of error. After reviewing the facts of the case and pertinent law, we affirm the juvenile court's judgment.

## II. Hearing Testimony

### A. Father's Case-in-Chief

#### 1. Father

{¶ 14} Father testified that he filed various motions to show cause for missed parenting time and motions for custody of A.M., and the "result of those proceedings was the [SPS] * * * with the extra make-up time." Father testified that on multiple

days in 2019 and 2020, Mother did not make A.M. available for Father's scheduled visitation times, including 20 holidays, nine weeks of vacation time, four "make-up" weekends, and ten regularly scheduled weekends. Father also testified as to the multiple times that Mother was late in picking up and dropping off A.M.

{¶ 15} Father testified concerning these dates from a "log of missed time," and it was established that he did not know how late Mother was on any given day, in part, because Stepmom was the person who many times picked up and dropped off A.M. Father also could not recall anything about the missed parenting time other than the dates he read off the log.

{¶ 16} Father testified about an allegation that Stepmom was abusing A.M. According to Father, Child Protective Services conducted an investigation and determined that the allegation was unsubstantiated. Father also testified about the allegation that Stepbrother sexually abused A.M. According to Father, ultimately the "charges" against Stepbrother were dismissed.

{¶ 17} Asked by the court to explain what "not being able to exercise * * * parenting time" has meant for A.M., Father testified as follows:

> I mean, this is terrible that my [child] has to go through this. I mean, we should, as adults, we should be able to communicate with each other, but that has not been the process. There's been several allegations against my household for her not to come to my household so she can grow up to be, one, with our side of the family, as well as [Mother's].
>
> These allegations have done nothing but traumatize my daughter. She's going to grow up believing that [S]tepbrother touched her or did something to her, which he did not, because she was told to say that.

{¶ 18} Asked how A.M. is when Father exercises his parenting time, Father stated that "[w]e have fun all the time. We sit. We watch movies together. We paint. We do activities. She rides her bike with me. We go to church."

{¶ 19} Father testified that he did not know what grade A.M. was in, what school she attended, or anything about A.M.'s medical records. Asked by the court if he has "gone to anybody and requested that information," Father replied, "I have not."

{¶ 20} The court asked Father about A.M.'s siblings on his side of the family. Father testified that he has four other children, three of whom A.M. has met. According to Father, when A.M. "does see them, she does get along with them." The court asked Father: "So can you explain to me why it would be in your daughter's best interest to be with you?" Father answered as follows: "I don't want to do nothing but do what's best for my daughter. I won't force her to lie. I won't force her to make some false allegations. I'd make sure she goes to the best school, she has the best care."

{¶ 21} Father specified that if he were designated the residential parent for school purposes, A.M. would attend Bedford schools. Father testified that A.M. knows other kids in his neighborhood and "she sees the kids at church and plays with them." Asked if he was "made residential parent," would he honor A.M.'s visitation with Mother, Father replied, "Yes."

## 2. Stepmom

{¶ 22} Stepmom testified that she is married to Father, and A.M. is her stepdaughter. Stepmom, Father, and Stepbrother live in a house in Bedford. A.M. has her own bedroom at this house when she stays with them.

{¶ 23} Stepmom testified that she has had a relationship with A.M. since A.M. was "a couple months old." In Stepmom's opinion, they have a "very good relationship," and during Father's parenting time, she and A.M. do "girly things like get our nails done," as well as "attend church, and we play, ride bikes, and, you know, educational learning things that we decide to [do] if I notice that she has an interest in things." Stepmom testified that she has observed "[n]o issues at all" with Stepbrother and A.M.

{¶ 24} Stepmom agreed that Mother exhibited a "pattern of late tardiness" with "drop-offs" of A.M. for Father's visitation time. Stepmom described this pattern as "[v]ery often. Almost everytime." According to Stepmom, the last time she and Father spent Christmas, Thanksgiving, or A.M.'s birthday with A.M. was in 2017 or 2018. Stepmom further testified that A.M. misses visits entirely "[v]ery regularly."

{¶ 25} Asked how she would care for A.M. if A.M. "lived with y'all full time," Stepmom answered as follows: "[A.M.] would become a member of our home on a more full-time basis than she's already a member of our home, and she will be treated with the best of our ability as any parent would." Stepmom further testified that she would be "willing to assist" facilitating parenting time between Father and

Mother. Asked about disciplining A.M., Stepmom testified as follows: "There doesn't need to be any methods of discipline with her. She is very mannerable, and if there's any correction that's needed, she usually will just ask and I'll be like, okay. But we never really got to any — any corrective actions or any type of discipline." Stepmom testified that the allegation that she abused A.M. "is totally false."

{¶ 26} Asked what she thought was in A.M.'s best interest, Stepmom testified as follows: "I believe that [A.M.] needs stability. I believe that she does not need constant back and forth and she needs a routine and regularity. I feel that — she needs what's in the best interests of her and — and that is consistency."

{¶ 27} Stepmom testified that she knew what school A.M. attended, although she has not been to any "school function, plays, parent/teacher conferences," because she was "never notified of any involvement of schooling."

## B. Mother's Case-in-Chief

### 1. Maternal Grandmother

{¶ 28} S.M. ("Grandmother") testified that A.M., who was six years old at the time of the hearing, is her granddaughter. A.M. visits Grandmother's home "quite often." According to Grandmother, A.M. is a "happy little girl" after having parenting time with Mother. Asked what A.M.'s "behavior" is like "when it comes to visitation" with Father, Grandmother testified as follows:

> Well, I've definitely witnessed her not wanting to go with [Father], and she states that very often. I've known for [Father] to come and pick her up a few times from the house on his visiting days, and just a couple of times he's been there maybe twice or so to pick her up, drop her off, but [S]tepmom, is normally the one that comes to the house and picks her up.

{¶ 29} Grandmother testified that she is "willing to facilitate visitation drop-off and pick-up" of A.M. Grandmother further testified that she and Stepmom have "[n]o problems at all," and that, although Father "barely speaks," she and Father have "[n]o problems."

{¶ 30} According to Grandmother, on the weekend of June 11 and 12, 2021, A.M. and another of Grandmother's granddaughters slept over Grandmother's house. A.M. "[w]oke up Saturday morning and she was panicking, she was crying." According to Grandmother, A.M. said, "I don't want to go to [Father's] house." Grandmother told A.M. that she was not scheduled to go to Father's house until Sunday. Grandmother continued her testimony as follows: "And that's when I realized that she — she has these panic attacks almost like she gets in a frenzy sometimes when she don't want to go and leave the house." Grandmother further testified that A.M. "was frantic. So that's why I know when she get into those crying attacks, that she's basically trying to get us to not send her over there. So it's sad."

{¶ 31} Grandmother testified that A.M. has told "us that [Stepmom] pinches her sometimes * * *." Grandmother asked A.M. what Father does about this, and A.M. told her "he just plays his game. And he's playing with his video game, or whatever, and he doesn't, I guess, protect her, is what I would say * * *."

{¶ 32} Grandmother further testified that, when A.M. was three years old, she said that Stepbrother

> touched her in her private area and he made her touch his private. And she said that he showed her pictures from a phone. I guess the pictures was, you know, explicit pictures, naked pictures.

And [A.M.] said, I just didn't want to be in the dark room anymore. I guess she was in a dark room. And so now she's afraid of the dark. We had to let her sleep with the light on for a long time because of that situation.

{¶ 33} According to Grandmother, A.M. was "a little nervous," "shaking," and "very upset" when she revealed this. The court asked Grandmother, "How did [A.M.] come about to tell you that?" Grandmother replied as follows: "We were just doing family things. I don't know if it just came, you know, automatic to her where she wanted me to protect her from whatever it was that [Stepbrother] was doing." According to Grandmother, she and her husband were in the room when A.M. made this allegation. Mother was not present.

{¶ 34} Grandmother testified that, when it comes to A.M.'s well-being, A.M. should be "[d]efinitely with the mom."

{¶ 35} Asked on cross-examination if she was aware that A.M. "indicates that her mother told her to say that" Stepbrother touched her, Grandmother testified, "No, never," and she would be "very surprised" if A.M. told anyone this.

### 2. Maternal Grandfather

{¶ 36} E.J. ("Grandfather") testified as follows about A.M.'s visitation and relationship with Father: "Well, she cries a lot when she's over my house and going to go over [Father's] house. She cries. Sometimes she'll tell [M]other that she don't want — she don't want to go over there. And then we * * * feel sorry for her." Asked by the court how often this happens, Grandfather testified that it is "about * * * everytime she's at my house waiting on them to come pick her up from my house." Grandfather testified that when A.M. visits Father's house, "[s]he be sad."

Grandfather continued: "She be real sad. She don't want to go. She was at the house one Saturday * * * and she woke up out of her sleep that morning crying because she didn't want to go. She thought it was Sunday. She didn't want to go over [Father's] house."

{¶ 37} Grandfather's testimony corroborated Grandmother's testimony that A.M. said Stepmom pinched her. Grandfather's testimony also corroborated Grandmother's testimony that A.M. told them "a little boy had her playing in his private area with her hand" while at Father's house.

{¶ 38} Grandfather testified that A.M. did not tell him that Mother "told her to tell people that [Stepbrother] touched her," and that he would be surprised if she testified to that in court.

### 3. Maternal Great-Grandmother

{¶ 39} S.J. ("Great-Grandmother"), who is Mother's grandmother, testified that her relationship with A.M. is "[p]erfect almost." According to Great-Grandmother, "until lately, [A.M.] was a very happy little girl. She was born a happy little girl. And now I see a sad side of her that I had never seen before." Asked to elaborate, Great-Grandmother testified as follows: "Well, about a couple of months ago, [Father] came to my home to pick [A.M.] up and before he got there — she knew that he was coming. Before he got there, she asked me could she please stay with me because she didn't want to go with [Father]." According to Great-Grandmother, A.M. "felt very afraid most of the time when she had to go with [Father]."

{¶ 40} Great-Grandmother corroborated other testimony introduced at this hearing that A.M. "said that she didn't like the way [Stepbrother] would take * * * her hand and put it on his private part. And she said * * * some white stuff, Gigi — I'm Gigi — would be on my hand and I didn't like that. * * * So [A.M.] would run to the bathroom and wash it off and cry and * * * stay in there until an adult came in the room." According to Great-Grandmother, Mother was not present when A.M. first disclosed this.

{¶ 41} On cross-examination, Great-Grandmother testified that A.M. and Mother are at Great-Grandmother's house after school "[m]aybe five times a week, six times sometimes. Sometimes every day."

### 4. Aunt V.J.

{¶ 42} V.J. ("Aunt") testified that A.M. is her niece, they are "very close," and she sees A.M. "on a daily basis." Aunt testified that "[w]e do a lot of family functions together, spend a lot of time with each other as a family."

{¶ 43} According to Aunt, A.M.

is to be with [Father] every Sunday and I just know that she doesn't like to go over there. She's not very happy about going over there when it's her time to go over there. * * * She cries. She has tantrums. * * * And each time it's time for her to go to her father's house, she is crying. She is saying how she doesn't want to go with [Father]. She'd rather stay with me or [Mother] or [Grandmother], whoever she is with at the time.

{¶ 44} Aunt testified that she has never witnessed A.M. cry when she has to go to anyone else's house.

{¶ 45} Asked if A.M. has disclosed "any concerns about visiting [F]ather's home," Aunt answered as follows: "She said that [Stepmom] pinches her and she

doesn't like to go to her [Father's] house because she is always with [Stepmom] and [Stepmom] makes her call her mommy and makes her do and say stuff that she doesn't want to do and say."

{¶ 46} Aunt testified that she was with Mother "[i]n the beginning * * * every week" when she would pick up and drop off A.M. for visitation with Father. According to Aunt, "[m]ost of the time [Father and Stepmom] were late. And we're not talking five, ten minutes late. It would be 30, 40 minutes late. Sometimes there would be a miscommunication with them saying they were going to come at one time and not coming until a completely different time."

### 5. Cousin S.J.

{¶ 47} S.J. ("Cousin") testified that she is a cousin to A.M. and she has been in A.M.'s life since A.M.'s birth. She did not observe A.M. and Father interact until A.M. was three years old. In August 2018, Cousin, Grandmother, and Mother "went to pick [A.M.] up for a visit and [Father and Stepmom] wouldn't let [A.M.] come home and we had to contact law enforcement * * * to get [A.M.] that day." According to Cousin, it was Mother's "parenting week." Cousin testified that, while Mother and Father were speaking with the police to sort out A.M.'s visitation, Stepmom put A.M. in the car "and tried to pull out of the driveway * * *."

{¶ 48} The court asked Cousin what she has observed about A.M. when A.M. is getting ready to visit Father. Cousin responded that in 2018, 2019, and 2020, when she would accompany Mother to drop A.M. off at the "meet-up location," A.M. "was kind of sad" and said that she did not "want to go. I want to go with [Mother].

Or, I want to stay with you. Or she would name like anybody in the family and she would just always say she didn't want to go."

### 6. Mother

{¶ 49} Mother gave a statement under oath as part of her case-in-chief. Mother testified that she feels that "it is unsafe and unhealthy" for A.M. to go to Father's home, because of A.M.'s "allegations * * * about neglect, sexual abuse, corporal punishment, and * * * just an unsafe environment at [Father's] home." According to Mother, A.M. "has stated * * * numerous amount of times that she does not like to go to [F]ather's home. She's also said that it makes her afraid. She rarely sees [F]ather." Mother continued:

> When [A.M.] is going to [F]ather's house, it is provoking towards her emotions. She — She's sad. She's always talking about, Mommy, please don't let the Court send me to my dad's home. She's always saying, Mommy, can I please tell the Judge that I don't want to go to my dad's home?
>
> So she's very stern in delivering that she do not want to go to [F]ather's home.
>
> When it comes to her going over there for full custody, I do not feel like that's the best fit for her or in the interest of her given that so many different events have happened.

{¶ 50} The court asked Mother to explain events that she observed.

> It came a time where the communication is just so thrown off that they wanted to request her to be — to spend more time over there for their wedding.
>
> Instead of them communicating that with me, they instead just went ahead and did whatever they wanted to do beyond that. Meaning, they kept her during my time period. [Stepmom] tried to pull off out of the driveway with [A.M.] in the car while police officers were telling her to

— and this I witnessed — while police officers were telling her to exchange [A.M.].

It's chaotic, it's draining, * * * it's a burden on [A.M.], my family, our livelihood, ever since [Father] entered [A.M.'s] life. It's just been a huge burden.

[A.M.] is not happy over there.

{¶ 51} Mother attempted to talk about "many different paperworks from different people or different officials saying that [A.M.'s] best interest is with myself * * *." However, the court stopped Mother and stated the following: "But none of that you produced. Nobody's testified to that. * * * That it's in the best interest that [A.M.] be in your care and custody." Mother stated that she had "documents," and the court responded by stating, "But again, the person that wrote the document needs to be here to testify."

{¶ 52} Mother testified that Father was there for A.M.'s birth, he "disappeared after she turned about two months old," and then reappeared on A.M.'s second birthday. Mother testified that her house is "very stable." It has two bedrooms — one for A.M. and one for Mother, Mother's fiancé, and their seven-month-old son. They live in Cleveland, "[a]bout 25 to 27 minutes away" from Father's house.

{¶ 53} Mother testified that on the night of October 23, 2019, A.M. was sexually abused by Stepbrother. Mother learned this because A.M. told her. Mother testified that Grandfather previously told her that A.M. also told him, "but he didn't give detail, so I wasn't sure of what he was talking about." Mother continued: "But then not too long after, [A.M.] came out and told me, and she said, Hey, mommy,

[Stepbrother] be making me touch his poon-poon — is what she was taught at that time — [Stepbrother] be making me jiggle his poon-poon, and this white — it'd be white stuff on my hands and I don't like it, so I go wash it off in the bathroom."

{¶ 54} Mother testified that she has always notified Father if A.M. was going to miss a visit, and she has offered "to make up some time. * * * So I've always gave alternatives. It was never a she's not going to see you. She barely sees him. She's always spending all of her time with [Stepmom]." Mother testified that on June 4, 2019, which was A.M.'s birthday, Mother notified Father that A.M. would be out of town. Mother asked Father "if he would like to make up that day" with "additional time." According to Mother, Father never responded.

{¶ 55} Near the end of Mother's testimony, she referred to the GAL report, which recommended "Legal Custody to Mother [as being] in [A.M.'s] best interest, with Father on a standard visitation schedule of every other weekend and one weeknight. This recommendation is in accord with [A.M.'s] express wishes." The court noted that the GAL report "is two or three years old." In fact, the GAL report was filed on May 10, 2019, and the hearing at issue took place on April 7, 2022.

{¶ 56} During cross-examination of Mother, Father's attorney asked about certain dates that Father and Stepmom alleged Mother denied them visitation with A.M. Mother did not recall what occurred on some dates, and she admitted denying visitation on some dates, but always with the caveat that she notified Father and Stepmom first or that she offered a makeup visit. Mother testified that she did not make A.M. available to Father on his wedding day.

{¶ 57} Mother testified that it is in A.M.'s best interest to have a relationship with Father, "[a]s long as it's healthy. * * * As long as he protects her. As long as he's making sure that she's safe." Mother further testified that, from her perspective, "it's definitely an unhealthy relationship between [A.M.] and [F]ather and everyone who resides in his home." Mother further testified that the conclusion is the same "from [A.M.'s] perspective, from my family members' perspective, from [A.M.'s] professional therapist's perspective, from Child Protective Services' perspective, as well * * * as the [GAL]."

{¶ 58} Mother testified that, despite issues in the past, she would be able to comply with court orders if she were to remain the "custodial parent."

{¶ 59} During cross-examination, Mother was asked if she would be surprised to learn that her apartment was listed as a one-bedroom, considering that she earlier testified that she, her fiancé, and A.M. live in a two-bedroom house. Mother explained that they "converted" it into a two-bedroom and that she and her fiancé sleep in the living room, while A.M. "has the one bedroom." It was also established that Mother's fiancé was convicted of felony drug trafficking more than ten years prior to the hearing.

## III. Law and Analysis

### A. GAL Report and Appointment

{¶ 60} We address Mother's first and second assignments of error together.

{¶ 61} In Mother's first assignment of error, she asserts that the "trial court erred and abused its discretion by violating Mother's due process rights when it

considered an almost three-year-old [GAL] Report, when the [GAL] was not present for trial."

{¶ 62} In Mother's second assignment of error, she asserts that the "trial court erred and abused its discretion when it failed to appoint a new [GAL] once the previous [GAL] had filed a motion to withdraw and stopped showing up for hearings years into the case."

{¶ 63} We disagree with Mother's first two arguments.

{¶ 64} On November 20, 2018, the court appointed a GAL for A.M. In the accompanying journal entry, the court stated, "[T]his assignment shall remain in effect until discharged by order of court or by filing of a final order in this matter * * *." According to the record, the court did not order the GAL discharged in this case. Additionally, the GAL did not file a motion to withdraw.[1] Therefore, we find that the appointment of the GAL was still in effect at the time of the April 7, 2022 hearing. Because the GAL was not discharged, nor did he file a motion to withdraw, we cannot say that the court erred by failing to appoint a new GAL, as posited by Mother's second assignment of error.

{¶ 65} Furthermore, it does not appear from the record that the GAL in the case at hand received notice of the April 7, 2022 hearing. It is undisputed that the GAL was not present at this hearing. As to the weight given to the three-year-old

---

[1] In Mother's appellate brief, she states that the GAL "filed a motion to withdraw on June 26, 2020 * * *." We note that this is not true. Rather, on June 26, 2020, Mother's first appointed counsel filed a motion for leave to withdraw.

GAL report admitted into evidence in this case, we find that this issue is best addressed under Mother's fourth assignment of error.

{¶ 66} Accordingly, Mother's first and second assignments of error are overruled.

## B. Change in Circumstances

{¶ 67} In Mother's third assignment of error, she argues that the "trial court abused its discretion when it failed to make a finding of a change in circumstances and immediately went to the best interest factors when no shared parenting plan exists, and applied the wrong legal standard and inapplicable case law."

{¶ 68} At the April 7, 2022 hearing, prior to the parties introducing testimony and evidence, the court stated the following regarding the SPS:

> The parties entered into an agreement. They call it a shared-parenting agreement, but it really wasn't a share[d]-parenting agreement under 3109.04, in 2018. It simply allocated the parental rights, that is possession and visitation. There is no attached support calculation or provision for medical expenses, et cetera. So it is my understanding then this was just an allocation of parental rights at that time. Is that your understanding?

{¶ 69} Mother indicated yes, and counsel for Father stated, "I believe so." The court further found that the subsequent modification of the SPS also "did not meet the standards under 3109.04 of a shared-parenting agreement. So I'm going to treat it as a finding — agreement of parental rights and responsibilities."

{¶ 70} In the journal entry concerning the April 7, 2022 hearing, the court stated that the SPS and the mutual agreement modifying the SPS, both of which were adopted by the court, are "Shared Parenting Order[s]." The court further

stated as follows: "The Court does find a change in circumstances occurred from the Court's last order to the parenting rights and responsibilities caused by Mother's failure to honor the Court's Order of parenting time rights affecting the child and the Father generally."

{¶ 71} Because the court did find a change of circumstances, we overrule Mother's third assignment of error. We address the best interest of the child under Mother's fourth assignment of error.

### C. The Trial Court's Findings Regarding Best Interest of the Child — Manifest Weight of the Evidence and Abuse of Discretion

{¶ 72} In Mother's fourth assignment of error, she argues that the "trial court abused its discretion by applying the best interest factors in a way that was against the manifest weight of the evidence."

{¶ 73} Notwithstanding Mother's argument that the court applied the best-interest factors in a way that was against the manifest weight of the evidence, "we review a trial court's decision in a child custody matter, including whether it is in a child's best interest to modify a shared-parenting plan, for an abuse of discretion." *In re G.B.*, 8th Dist. Cuyahoga No. 110730, 2022-Ohio-382, ¶ 64.

{¶ 74} This matter was before the juvenile court pursuant to R.C. 2151.23 (F)(1), which states that "[t]he juvenile court shall exercise its jurisdiction in child custody matters in accordance with sections 3109.04 * * * of the Revised Code." *See also In re M.S.*, 8th Dist. Cuyahoga No. 99563, 2013-Ohio-4043, ¶ 8 ("When a juvenile court exercises jurisdiction over custody matters pursuant to R.C. 2151.23, it must do so in accordance with R.C. 3109.04.").

{¶ 75} "[W]here the trial court only modifies parenting time and the designation of the residential parent for school purposes, * * * R.C. 3109.04(E)(2)(b) applies, i.e., the trial court need only find that the modification is in the best interest of the child." *In re G.B.* at ¶ 58.

{¶ 76} On appeal, Mother requests that this court apply R.C. 3109.04(E)(1)(a), rather than R.C. 3109.04(E)(2)(b), "[b]ecause Father requested the allocation of parental rights and responsibilities be modified to name him the sole residential parent and custodian of [A.M.]." Here, the juvenile court did not grant this motion and did not name Father the sole residential parent. Therefore, R.C. 3109.04(E)(1)(a) is inapplicable.

### 1. The Court's Modification of Parenting Time and the Designation of the Residential Parent for School Purposes

{¶ 77} In the case at hand, the court's May 5, 2022 journal entry granted in part the pending motions to modify the SPS. The court stated that "both Mother and Father shall remain custodial and residential parents * * *," thus denying modification of shared custody. However, the court further stated that "Father * * * shall be designated the residential parent for school purposes," thus granting modification in this respect. Additionally, the court modified the allocation of parenting time pursuant to the SPS as follows:

> a) Mother's parenting time is Friday at 4:00 p.m. to Sunday at 8:00 p.m. during the school term on the first, second, and fourth weekends of the month.

> On Summer break, Mother's parenting time shall be Thursday at 5:00 p.m. to Sunday at 8:00 p.m. on her designated weekends above.

Holidays, vacations, and birthdays shall remain the same as the May 7, 2018, Agreement * * *.

b) Father's parenting time is any time not designated to Mother * * *.

## 2. The Court's Findings Regarding Best Interest Pursuant to R.C. 3109.04(F)

{¶ 78} In the case at hand, the court's judgment entry states the following concerning the best interest of A.M.

> Mother's witness[es] testified that A.M. was reluctant to visit Father. Mother's case also was based on the closeness of her family and their support in contrast to the lack of time she alleged Father spent with A.M. during his parenting time.

> Father countered that he did have good quality time with A.M. during his parenting time, [and Stepmom] had quality "girly time" with A.M.

> * * *

> A.M. is a precious young child who both parents claim they love and support. Both parents claim they are acting in [A.M.'s] best interest; however, neither parent appears to want to forgive A.M.'s other parent's past perceived shortcomings; or inability to effectively make A.M.'s exchanges timely or consistently; or to effectively make A.M.'s exchanges stress free for A.M. or work towards effective communications in A.M.'s best interest.

> The bulk of the testimony was on negative perceptions of the other parent. The Court encourage[s] the parents and their families to support and to allow A.M. * * * to feel loved and supported by respecting and cooperating with the other parent.

> * * *

> [T]he drop-off and pick-up of A.M. at a police station is not in A.M.'s best interest. [The] drop-off and pick-up of A.M. shall be at [Grandmother's] home.

> * * *

> [The sexual molestation] allegation [concerning Stepbrother] is a safety factor for A.M. * * *

A [s]ubsequent * * * investigation found the allegations did not occur or found them to be unsubstantiated.

Caution requires eliminating unsupervised contact between both A.M. and [Stepbrother] in the best interest of both children and should negate any reason for future allegations or concerns by either parent.

* * *

A.M. and [Stepbrother] should not be together without adult supervision. A.M. and [Stepbrother] are not to be together behind closed doors.

### 3. Evidence in the Record Regarding Best Interest Pursuant to R.C. 3109.04(F)

{¶ 79} R.C. 3109.04(F) directs the juvenile court to consider "all relevant factors," including but not limited to factors identified when determining the best interest of a child in custody matters. The following is a review of the evidence presented at the April 7, 2022 hearing that relates to the R.C. 3109.04(F)(1) and (2) best-interest factors.

{¶ 80} Subsection (1)(a) guides the court to consider "[t]he wishes of the child's parents regarding the child's care[.]" Through testimony presented, Mother and Father each arguably established that they "wished" to share parenting time of A.M.

{¶ 81} Subsection (1)(c) concerns A.M.'s "interaction and interrelationship with" Mother, Father, and their respective families. Mother presented an abundance of testimony that she and her family have a good relationship with A.M. Mother further presented testimony that A.M.'s relationship with Father and his family was strained, including allegations of abuse. Father, on the other hand,

presented testimony that he and Stepmom had "quality" time and a good relationship with A.M. Father and Stepmom denied the allegations of abuse.

{¶ 82} Subsection (1)(f) addresses which parent is "more likely to honor and facilitate court-approved parenting time rights or visitation * * *." Subsection (1)(i) considers "[w]hether [either] parent * * * has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court * * *." Testimony presented at the hearing showed that Mother and Father each withheld parenting time from the other. We note that the bulk of the testimony concerned Mother failing to honor and facilitate parenting time for Father. However, Mother and Father each testified that they would honor and facilitate parenting time pursuant to the SPS going forward.

{¶ 83} Subsection (2)(a) calls on the court to assess "[t]he ability of the parents to cooperate and make decisions jointly, with respect to the [child]." As discussed, Mother's and Father's evidence showed that they have a history of not being able to cooperate and make decisions jointly regarding A.M.

{¶ 84} Under subsection (2)(b), courts should consider "[t]he ability of each parent to encourage the sharing of love, affection, and contact between the child and the other parent * * *." As discussed, Mother and Father's evidence showed that they have a difficult time encouraging A.M. to have a loving relationship with the other parent.

{¶ 85} Under subsection (2)(c), "[a]ny history of, or potential for, child abuse * * *" should be included in the analysis. Mother testified regarding "allegations * * *

about neglect, sexual abuse, corporal punishment, and * * * just an unsafe environment at [Father's] home." Mother also presented the testimony of several witnesses who consistently recounted the abuse allegations concerning A.M. and Stepbrother. Father and Stepmom denied these allegations, noting that they were unsubstantiated in other court proceedings.

{¶ 86} Subsection (2)(e) calls on the court to take into account "[t]he recommendation of the [GAL] of the child, if the child has a [GAL]." The court stated in its journal entry that it "took judicial notice of the GAL report of May 10, 2019, to give the Court background and history of the case." We note that the GAL did not make a statement at the April 7, 2022 hearing, and the GAL report at issue was three years old at the time of the hearing. Nonetheless, the GAL report recommended that "Legal Custody to Mother would be in [A.M.'s] best interest, with Father on a standard visitation schedule of every other weekend and one weeknight."

### 4. Analysis Regarding Best Interest Pursuant to R.C. 3109.04(F)

{¶ 87} "Decisions in child custody matters are among 'the most difficult and agonizing decisions a trial judge must make.'" *In re G.B.*, 8th Dist. Cuyahoga No. 110730, 2022-Ohio-382, at ¶ 64, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 674 N.E.2d 1159 (1997). "Therefore, a trial judge must have wide latitude in considering all the evidence before him or her * * * and such a decision must not be reversed absent an abuse of discretion." *Davis* at 418. "The reason for this standard of review is that the trial judge has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on

the written page." *Id.* An abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

**{¶ 88}** After reviewing the R.C. 3109.04(F) best-interest factors, the evidence presented by the parties at the April 7, 2022 hearing, and the trial court's findings in its May 5, 2022 journal entry, we cannot say that the court abused its discretion by modifying the designation of the residential parent for school purposes and the parenting time schedule.

**{¶ 89}** The trial court found that the "vast majority of testimony in Father's case was spent on missed or delayed parenting time and Mother's inability to provide parenting time or to communicate effectively in regard to parenting time." The court further found that the "vast majority of testimony in Mother's case concerned an alleged sexual incident at Father's home concerning" Stepbrother.

**{¶ 90}** Although not necessarily related to any of the R.C. 3109.04(F) factors, Father testified that it would be in A.M.'s best interest to "be with" him for the following reasons: "I don't want to do nothing but do what's best for [A.M.]. I won't force her to lie. I won't force her to make some false allegations. I'd make sure she goes to the best school, she has the best care."

**{¶ 91}** Stepmom testified as follows about what she thought would be in A.M.'s best interest: "I believe [A.M.] needs stability. I believe that she does not need

constant back and forth and she needs a routine and regularity. I feel that — she needs what's in the best interest of her and — and that is consistency."

{¶ 92} Mother testified that it would be in A.M.'s best interest to have a "healthy" and "safe" relationship with Father. Mother did not expressly state that it would be in A.M.'s best interest to live with Mother, although this notion can arguably be implied from Mother and Mother's witnesses' testimony.

{¶ 93} We turn to the R.C. 3109.04(F)(1)(b) best-interest factor, which involves "the wishes and concerns of the child, as expressed to the court * * *." In making this determination, pursuant to R.C. 3109.04(B)(1), whether to conduct an in-chambers interview of A.M. was within the court's discretion absent a request by either party. In the case at hand, the court did not conduct an in-chambers interview of A.M. Additionally, because A.M. was not interviewed by the court, it was within the court's discretion whether to appoint a GAL. R.C. 3109.04(B)(2)(a). In the case at hand, the court appointed a GAL more than three years prior to the April 7, 2022 hearing. However, this GAL did not make a statement at the evidentiary hearing. Rather, the court took "judicial notice" of an outdated[2] report authored by the GAL.

{¶ 94} Although it is somewhat concerning that A.M.'s wishes did not appear to be presented at the hearing, we cannot say that this constitutes an abuse of discretion. In *In re G.B.*, the child at issue was 13 years old at the time of the hearing. *In re G.B.*, 8th Dist. Cuyahoga No. 110730, 2022-Ohio-382, at ¶ 74. The court

---

[2] A.M. was born on June 4, 2015. The GAL report was filed on May 10, 2019, when A.M. was one less than one month shy of four years old. The evidentiary hearing took place on April 7, 2022, when A.M. was almost seven years old.

conducted an in camera interview of G.B., who expressed her wish that Father be designated the residential parent for school purposes because she wanted to remain in a certain school district. *Id.* at ¶ 68, 75.

{¶ 95} G.B.'s GAL submitted a report to the court in February 2020, which recommended that Mother be designated the residential parent for school purposes, and Father be granted "liberal parenting time." *Id.* at ¶ 14. The GAL testified at the evidentiary hearing in June 2021, over a year after the report was filed. The GAL "maintained" that Mother be designated the residential parent for school purposes, despite this being against G.B.'s wishes. *Id.* at ¶ 36. Furthermore, the GAL testified that "she had last spoken with G.B. in January 2020 — nearly 18 months before the hearing — and could not recall when she had last spoken with Mother or Father." *Id.* at ¶ 41.

{¶ 96} This court found no abuse of discretion in the trial court's designation of Mother as the residential parent for school purposes and the modification of parenting time. This designation was consistent with the GAL's recommendation, but inconsistent with G.B.'s wishes as expressed at the in-chambers interview. "Although the juvenile court was required to consider G.B.'s wishes in determining what was in her best interest, her wishes were not controlling and the juvenile court was not required to weigh G.B.'s wishes more heavily than other relevant factors when determining what was in her best interest." *Id.* at ¶ 74. The *G.B.* Court further found that "[a]lthough a change in school districts might result in increased anxiety for G.B. — at least on a temporary basis — there is nothing in the record to indicate

that that risk outweighed the potential benefits of designating Mother as the residential parent for school purposes." *Id.* at ¶ 76.

{¶ 97} We find that the procedural posture of *In re G.B.* was substantially similar to the procedural posture in the case at hand. In both cases, the trial court maintained shared custody between both parents, modified the designation of the residential parent for school purposes, and modified the parenting time accordingly. Also, in both cases, the trial court issued a thorough journal entry evidencing that it considered the best interest factors delineated in R.C. 3109.04(F). In *In re G.B.,* there was an abundance of evidence relating to the best interest of the child. *See generally In re G.B.*, 8th Dist. Cuyahoga No. 110730, 2022-Ohio-382, at ¶ 12-44. In the case at hand, the trial court noted, and we agree, that the evidence in the record mostly concerned the contentious relationship between Mother and Father. Nonetheless, Mother has failed to demonstrate, on appeal, that the trial court acted against A.M.'s best interest and abused its discretion when it modified the designation of the residential parent for school purposes and the parenting time.

{¶ 98} Accordingly, Mother's fourth assignment of error is overruled.

### D. R.C. 2151.352 Right to Counsel in Juvenile Proceedings

{¶ 99} In Mother's fifth and final assignment of error, she argues that the "trial court erred when it failed to reappoint Mother counsel for the show cause."

{¶ 100} The January 28, 2022 journal entry reflecting a "Pre-trial hearing" indicates that Mother was present, pro se. As stated previously, the court found Mother indigent and appointed counsel on the two occasions, December 17, 2018,

and again on November 7, 2019, that Mother requested it. It is unclear from the record what occurred that resulted in Mother appearing pro se at the April 7, 2022 hearing.

{¶ 101} At this hearing, prior to the parties introducing testimony and evidence, the court found that Mother is

> in court, pro se. I, at the pretrial, indicated that it would be best to find counsel, however, she has a right to proceed pro se and she is. * * * We had the discussion at the last pretrial, in which * * * she * * * strongly indicated that she wishes to represent herself. That is still — I asked her earlier, if that's still her position, so we're going to proceed.

Mother lodged no objection to the court's statement.

{¶ 102} Under these circumstances, we find no error in the trial court proceeding on April 7, 2022, with mother acting pro se. Accordingly, Mother's fifth assignment of error is overruled.

{¶ 103} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY EILEEN KILBANE, P.J., and
SEAN C. GALLAGHER, J., CONCUR